UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br>　v.<br>GEORGE WYATT ELMS,<br>　　　　　　　Defendant. | Case No. 3:20-cr-00021-MMD-CLB-1<br><br>ORDER |

**I.　SUMMARY**

Defendant George Wyatt Elms was indicted on three counts regarding the government's allegation that he and a co-Defendant[1] broke in through the roof of a hardware store in Winnemucca, Nevada and stole some 25 firearms after setting a brushfire as a distraction. (ECF No. 10.) Before the Court is Mr. Elms' motion to suppress: (1) statements he made during an interrogation after purportedly invoking his right to remain silent and any evidence derivative of those statements; and (2) the direct and derivative fruits of a search of the Frontier Motel in Winnemucca under a purportedly overbroad warrant.[2] (ECF No. 62 ("Motion").)[3] Because the Court agrees with the

---

[1]Travis Klyn, who has since pleaded guilty. (ECF No. 66.)

[2]The government argues this portion of the Motion is moot because it does not intend to introduce any evidence gathered from the search of the Frontier Motel at trial, and there is no evidence to suppress in any event. (ECF No. 68 at 10-11.) Elms does not respond to the government's argument in his reply but does include this sentence in his conclusion: "Additionally, the direct and derivative fruits of the Frontier Motel search must be suppressed, including the interview of the 'known but unnamed' room occupant." (ECF No. 70 at 9-10.) The Court agrees with the government that the portion of the Motion regarding the search of the Frontier Motel is moot and denies it on that basis. However, the denial is without prejudice to Mr. Elms renewing this argument in the event the government reverses itself and later attempts to introduce some evidence gathered from the search of the Frontier Motel against him.

[3]The government filed a response (ECF No. 68), and Mr. Elms filed a reply (ECF No. 70).

1  government that Mr. Elms did not unambiguously invoke his right to remain silent, and as
2  further explained below, the Court will Deny the Motion.

## II.  FACTUAL BACKGROUND

The Court relies on documents filed by the parties in support of the Motion and related briefs to construct this factual background, most notably an audio recording of the challenged interrogation.

The hardware store in Winnemucca was robbed in the very early morning hours of February 19, 2020. (ECF No. 68-1 at 2.) Police discovered the brushfire that same night. (ECF No. 68-2 at 2.) Police subsequently received an anonymous tip that Mr. Elms was involved in the burglary. (ECF No. 68-5 at 2.)

Later that same day, February 19, Mr. Elms was arrested in Reno on an unrelated probation violation; he failed a drug test. (ECF No. 62-1 at 8.) Mr. Elms was taken to the Washoe County Detention Facility ("WCDF"). (*Id.*) Two agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") learned of this and went to WCDF the evening of February 21 to interview him. (*Id.*; *see also* ECF No. 68-4 at 2.)

The two ATF agents[4] began the interview by reading Mr. Elms his *Miranda* rights and asking him if he would sign a consent form indicating he had been read his *Miranda* rights—he agreed and signed the form. (*Id.* at 2 (stating as such), 4 (signed consent form); *see also* ECF No. 62-2[5] at 2:20-3:30 (reading Mr. Elms his *Miranda* rights and Mr. Elms signing the consent form).) The ATF agents began the interrogation by chatting with Mr. Elms about his background; where he's from, where he works or has worked, etc. At around the 13-minute mark, the ATF agents ask Mr. Elms if he knows anything about the "shenanigans" that were going on out in Winnemucca; Mr. Elms responds that he heard about the firehouse getting robbed. (*Id.* at 13:00-13:24.)

---

[4]The Court cannot tell which ATF agent is speaking at which times on the recording, so the Court will generically refer to them as 'an ATF agent' or 'the ATF agent.'

[5]This exhibit is a DVD-ROM containing an audio recording of the ATF agents' interview of Mr. Elms, so the Court's citations refer to the minute:second marks within the audio recording.

1    The ATF agents were not interviewing Mr. Elms about the firehouse. They were there to learn about the hardware story burglary. After talking for a few more minutes about Winnemucca, one ATF agent states, "well, obviously we're here for a reason." (*Id.* at 15:57-16:00.) Mr. Elms responds, "right," "I'm not that popular," and chuckles. (*Id.* at 16:00-16:08.) An ATF agent continues from there to prompt Mr. Elms as to whether he knows why the ATF agents are there to interview him, and Mr. Elms says a few times that he does not know, eventually offering that he might have some information for them if they tell him why they are here to interview him. (*Id.* at 16:08-17:03.) One ATF agent then tells Mr. Elms that he "already knows" Mr. Elms is "bullshitting with me a little bit" because the agent knows Mr. Elms was staying at the Frontier Motel, and Mr. Elms denies it, though Mr. Elms then concedes he had a room there, room 19, and he had heard it had been raided. (*Id.* at 17:04-19:05.)

One of the two ATF agents then moves the conversation along by saying, "Alright, so, the bottom line is that a store was hit; I think you know what I'm talking about." (*Id.* at 19:45-19:49.) Mr. Elms responds, "okay." (*Id.* at 19:50.) The ATF agent counters, "a bunch of guns were stolen from that store, you know anything about that?" (*Id.* at 19:49-19:54.) Mr. Elms responds, "maybe." (*Id.* at 19:55-19:56.) After the ATF agent follows up by asking what he knows about that, Mr. Elms responds that he knows who did it. (*Id.* at 19:57-20:02.)

For the next couple of minutes, under prompting from the ATF agents, Mr. Elms declines to say much more, and says that he was not there, but that a friend told him that a man named Cruz was planning the burglary of the hardware store. (*Id.* at 20:03-21:50.) One ATF agent seeks clarification that they are all talking about the same thing, and Mr. Elms says that he thinks they are—C.B. Brown's. (*Id.* at 21:50-21:57.) One ATF agent asks Mr. Elms what that is, and Mr. Elms responds "you know what it is;" a "True Value" hardware store. (*Id.* at 21:57 at 22:13.)

///

///

3

For the subsequent few minutes, the ATF agents try to get more information from Mr. Elms about the burglary of the hardware store, suggesting that he was involved in it and will be held responsible for it, though Mr. Elms continues to deny any involvement. (*Id.* at 22:13-25:45.)

At this point, one of the ATF agents again returns to his belief that Mr. Elms is "bullshitting" them. (*Id.* at 25:45-25:50.) The ATF agent says that they know more than they have thus far let Mr. Elms know. (*Id.* at 25:50-26:00.) Mr. Elms responds, "I had nothing to do with that hit." (*Id.* at 26:00-26:05.) The ATF agent counters again with his view that if Mr. Elms continues to sit there and say he did not do anything, it will not do Mr. Elms any good. (*Id.* at 26:06-26:21.) Mr. Elms responds, "I'm not saying I didn't do anything; I did a lot." (*Id.* at 26:21-26:24.) The ATF agent basically responds, 'sure, you told us you did drugs, but we're not here to talk about that.' (*Id.* at 26:25-26:44.) "But, once again," the ATF agent continues, "if you're just going to sit here and bullshit us about what happened that day, we're not going to get anywhere." (*Id.* at 26:45-26:50.) This segues into the portion of the conversation at the heart of the Motion.

The agent continues, telling Mr. Elms:

> We have a lot of information. This is your chance to be honest with us, come forward like a man, and just say what happened that night. There's already a shit ton happened since you've been in here, alright. So, if you want to lay it out there and talk to us, and get your side of the story of what happened. I know, I already know a lot.

Mr. Elms: Okay.

Agent: Is that something you want to do? Do you want to talk to us?

Mr. Elms: No,[6] I have nothing to say about it other than that.

Agent: No?

Mr. Elms: No.

Agent: Okay, okay. So surveillance footage, man […] shows it, those guns are gone, you're getting done dirty right?

///

---

[6] The Court agrees with Mr. Elms that he said no (ECF No. 70 at 1-3), and correspondingly disagrees with the government that Mr. Elms said 'nuh' (ECF No. 68 at 5, 5 n.2), but also does not see why this distinction matters.

4

1  (*Id.* at 27:00 to 27:47.) Mr. Elms then responds no after asking what the agent means by
2  'getting done dirty.' (*Id.* at 27:47-27:49.)

3         The next several minutes of the conversation proceed in a similar fashion, with the
4  ATF agents trying to get Mr. Elms to admit to his involvement in the burglary, by
5  suggesting that he has been lying and revealing more information they have about him,
6  and Mr. Elms denying any involvement, in part by explaining that he could get killed if he
7  discloses his involvement. (*Id.* at 27:49-34:00.) At around the 34-minute mark, the ATF
8  agents explain to Mr. Elms that they may be able to offer him a cooperation agreement if
9  he can help them locate the guns stolen from the hardware store. Mr. Elms asks the
10 agents, "what would you do, man?" (*Id.* at 34:22-34:25.) One of the ATF agents again
11 encourages Mr. Elms to cooperate in response. (*Id.* at 34:25-34:42.) Mr. Elms then
12 reveals, "I provided a ride." (*Id.* at 34:43-34:45.)

13        From that point on in the interview, Mr. Elms explains his involvement in the
14 burglary of the hardware store (and the distracting brushfire) and provides the ATF agents
15 with related information. (*See id.* at 34:45-1:16:31.)

16 **III.   DISCUSSION**

17        Mr. Elms' Motion focuses on a few minutes of the audio recording of his
18 interrogation by the ATF agents at the WCDF. Mr. Elms argues that he invoked his right
19 to remain silent during this portion of his interrogation, but the ATF agents nonetheless
20 persisted questioning him in violation of his *Miranda* rights, warranting suppression of the
21 post-invocation statements and any derivative evidence. (ECF No. 62 at 6-8.) The
22 government counters that Mr. Elms was properly *Mirandized* at the outset of the
23 interrogation, he signed a consent form, and he never unambiguously invoked his right to
24 remain silent during the pertinent portion of the interrogation. (ECF No. 68 at 6-10.)
25 Instead, the government argues that Elms' statement, "[n]o, I have nothing to say about
26 it other than that[,]" was another denial from Elms that he was involved in the burglary.
27 (*Id.* at 8.) The Court agrees with the government.
28 ///

Mr. Elms makes a valid argument that does not quite fit the facts of the interrogation. To start, the legal rule governing the Motion is undisputed: agents must stop questioning a previously *Mirandized*, in-custody detainee if that person unambiguously invokes their right to remain silent, and any statements obtained following that unambiguous invocation may be suppressed. *See Jones v. Harrington*, 829 F.3d 1128, 1142 (9th Cir. 2016) ("The Supreme Court has repeatedly made clear that when a suspect simply and unambiguously says he wants to remain silent, police questioning must end."). The facts are not really in dispute, either. The parties agree that the key portion of the recording of the interrogation for purposes of the Motion is from about 25 minutes to 28 minutes. (ECF Nos. 62 at 3-4, 68 at 4-5.) And the Court has excerpted its understanding of that portion of the recording in Section II, above. The Court must therefore simply pick between the parties' competing interpretations of the key portion of the recording.[7]

Having listened to the recording several times, the Court's view is that, in the context of the interrogation, Mr. Elms' statement, "[n]o, I have nothing to say about it other than that[,]" fits with Mr. Elms' consistent, though periodically undercut, denials of any involvement in the burglary until later on in in the interrogation. It is not an invocation of his right to remain silent. Mr. Elms was instead stating that he did not know anything else about the burglary because he was not involved, as he had been doing for several minutes leading up to that point in response to the ATF agents' prompting that he admit to his involvement in the burglary. (*See* ECF No. 62-2 at 22:13-27:47.) Mr. Elms also persisted in that tactic for several minutes after saying "[n]o, I have nothing to say about it other than that[,]" before eventually admitting to his involvement in the burglary. (*Id.* at 27:48-34:45.) Thus, viewed in context of the interrogation, the statement "[n]o, I have nothing to say about it other than that[,]" is yet another denial of involvement in the

---

[7]Mr. Elms requested an evidentiary hearing. (ECF No. 62 at 1.) The government opposed his request. (ECF No. 73.) After reviewing the briefs and evidence submitted, the Court decided an evidentiary hearing was unnecessary. (ECF No. 74.) As noted herein, the Motion hinges on the Court's interpretation of the conversation that was undisputedly recorded and submitted with the Motion as Exhibit 2 (ECF No. 62-2).

burglary rather than an invocation of his right to remain silent.[8] *See, e.g.*, *United States v. Meza*, Case No. 15CR3175 JM, 2016 WL 4479396, at *6 (S.D. Cal. Aug. 25, 2016), *aff'd*, 800 F. App'x 463 (9th Cir. 2020) (reaching a similar conclusion where "the statement reasonably appears to be no more than a denial, or effort to withhold, further information.").

Admittedly, and as Mr. Elms argues (ECF No. 70 at 4-5), Mr. Elms' statement, "[n]o, I have nothing to say about it other than that[,]" followed the questions from the agent "[i]s that something you want to do? Do you want to talk to us?" (ECF No. 62-2 at 27:00-27:47.) Out of context, this could sound like an invocation of Mr. Elms' right to remain silent. But, as described above, within the context of the give-and-take of the interrogation, this statement is better interpreted as another denial of involvement in the hardware store burglary.

Moreover, there are two key words in Mr. Elms statement that make it an additional denial of his involvement in the burglary of the hardware store instead of an invocation of his right to remain silent—'it' and 'that.' In the context of the interrogation, 'it' must mean the burglary, and 'that' must mean Mr. Elms' most recent-in-time denial that he was involved in it. That also makes this statement distinguishable from the statement at issue in *Jones*, 829 F.3d 1128—the principal case that Mr. Elms relies upon in his Motion. (ECF No. 62 at 7-8.) The statement at issue in *Jones* was the superficially similar statement "I don't want to talk no more, man." *Jones*, 829 F.3d at 1134. But the *Jones* statement lacks the 'it' and 'that' making the most reasonable interpretation of Mr. Elms' statement that he was not going to change his position that he was not involved in the burglary of the hardware store—though, of course, he ultimately did change his position. Said otherwise, Mr. Elms did not broadly state that he did not want to talk any more, like the defendant

---

[8]There is also no dispute that the ATF agents read Mr. Elms his *Miranda* rights at the beginning of the interrogation, and Mr. Elms voluntarily signed a consent form. (ECF No. 68-4 at 2 (stating as such), 4 (signed consent form); *see also* ECF No. 62-2 at 2:20-3:30 (reading Mr. Elms his *Miranda* rights and Mr. Elms signing the consent form).) However, Mr. Elms could still have subsequently invoked his right to remain silent. *See Jones*, 829 F.3d at 1133, 1137-42 (9th Cir. 2016). But as explained herein, the Court finds that he did not.

did in *Jones. See* 829 F.3d at 1134. He was instead denying he was involved in the burglary.

And it was reasonable that the ATF agents apparently did not interpret Mr. Elms' statement as an invocation of his right to remain silent because Mr. Elms had admitted minutes earlier that he 'maybe' knew something about the burglary despite his consistent denials (ECF No. 62-2 at 19:55-19:56), and he spontaneously mentioned the name of the hardware store before the agents did (*id.* at 20:03-22:10). It was therefore reasonable for the ATF agents to infer Mr. Elms was lying about his involvement in the burglary, push him despite his denials, and see his statement "I have nothing to say about it other than that" as fitting within the pattern of denials Mr. Elms was offering them instead of interpreting the statement as an invocation of his right to remain silent.

At best, Mr. Elms' statement, "[n]o, I have nothing to say about it other than that[,]" is an ambiguous invocation of his right to remain silent—and even that would not be enough to cut off the interrogation. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *see also Jones*, 829 F.3d at 1137 (acknowledging that *Berghuis* added another layer to the *Miranda* inquiry: "Whether the suspect invoked his right to remain silent *unambiguously*.") (emphasis in original). But again, given the context of the interrogation, and as detailed above, the Court does not find Mr. Elms' statement an unambiguous invocation of his right to remain silent. The Court will accordingly deny the Motion.

## IV.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

///

///

///

///

It is therefore ordered that Defendant George Wyatt Elms' motion to suppress (ECF No. 62) is denied.

DATED THIS 30th Day of September 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE